UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 22-cr-10356-LTS |
| | ) | |
| ELIJAH MELTON, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>SUPPLEMENTAL BRIEF ON POTENTIAL CONFLICTS OF INTEREST</u>

The conflicts of interest in this case are unwaivable given all the circumstances and therefore disqualification is appropriate.

## <u>ADDITIONAL BACKGROUND INFORMATION</u>

### A. <u>Defendant's Filing Regarding Fees</u>

On July 9, 2025, Defendant filed materials concerning the payment of fees for the legal representation of Defendant. [Doc. 218 and attachments]. Per counsel's affidavit submitted in conjunction with the pleading, at Paragraph 2, Defendant's legal fees have been paid solely by Defendant's mother. Per counsel's affidavit, at Paragraph 3, the payments from Defendant's mother have consisted of three checks which were also attached to the pleading. The pleading further confirms that the payments were made to cover the legal costs associated with two pending federal criminal cases against Defendant – this case (which involves a significant federal drug conspiracy charge) and the pending case in the District of Rhode Island (Case No. 24cr00059) (which involves multiple charges related to the attempted murder of two prosecutors and a witness). This case is presently set for a jury trial on September 15, 2025. As discussed at the last hearing, the Rhode Island case appears to be set for jury trial on September 3, 2025.

1

The three checks alleged to constitute the full payment of legal fees in these two significant criminal cases are as follows:

1. A bank check for the amount of $20,000 issued on March 13, 2024;

2. A bank check for the amount of $20,000 issued on July 10, 2024; and

3. A personal check from Defendant's mother for the amount of $5,000 written on July 10, 2024.

Thus, the total amount of payments made for the legal representation of Melton in ***both*** criminal cases, per the Defendant's pleadings, is $45,000 - with the last payments being made approximately one year ago.

### B. Jail Correspondence from Defendant

While incarcerated in March 2024, Melton sent a letter to Kareem Pires – and associate of Melton who is charged with Melton in the Rhode Island case. The letter was recovered on or about March 18, 2024. In the letter, Melton instructed Pires as to what to do in various areas because Pires was overseeing Melton's drug operations and other interests while Melton was being held pretrial.[1]

In the letter, Melton informed Pires: "This is so you know what is going on with unc 40x16 = 640 5x30 = 150 plus old tab was 45." This communication involves a discussion of money owed by Melton to Theodore Richards (whom Melton refers to as "unc"[2]) for a shipment of cocaine and fentanyl. On this point, as set forth in the complaint affidavit in Case No.

---

[1] The government will file this letter under seal as Exhibit 1 to this Supplemental Brief.

[2] In electronic communications between Richards and Melton, seized from Melton's phone, Melton referred to Richards (who was using the screen name "James Jackson") as "uncle." *See* Exhibit 2.

25cr10288-LTS, the government has charged Richards and Melton as co-conspirators in a conspiracy to distribute and possess with intent to distribute cocaine and fentanyl, along with other controlled substances.  The complaint affidavit noted that Richards initially supplied Melton with 32 kilograms of cocaine and 4 kilograms of fentanyl in approximately late October 2023.  *See* Exhibit 3.  In this first shipment, Richards sent the drugs packaged in plastic buckets containing 8 kilograms of cocaine to 1 kilogram of fentanyl.  In late November 2023, Richards and Melton discussed a second shipment of drugs.  At around the same time, Melton complained about the quality of the fentanyl that he had received.  Both Richards and Melton referred to this type of fentanyl under a brand name "Mickey."[3]  *See* Exhibit 2.  In an electronic communication on or about November 20, 2023, Richards informed Melton that he would drop the price for kilograms of "Mickey" fentanyl to $30,000 per kilogram.  *See* Exhibit 4.

The numbers in the Melton letter are consistent with a second delivery of drugs by Richards to Melton.  In this second delivery, Richards added an additional bucket of 8 kilograms of cocaine and 1 kilogram of fentanyl.  Thus, instead of 32 kilograms of cocaine, Melton received 40 kilograms of cocaine (priced at $16,000 per kilogram) and, instead of 4 kilograms of fentanyl, Melton received 5 kilograms of fentanyl priced at $30,000, as discussed above. Melton's letter alerts his associate that they owe Richards $790,000 for the second shipment of drugs plus an additional $45,000 from the "old tab" – the first shipment.

In the letter, Melton noted there was "25k [$25,000] I was supposed to give to unc …" Later in the letter, Melton instructed Pires: "give unc the 25 I just gave the lawyer 20 so thats 45 75 if I go to the hoop 50 if I dont …"  In this communication, Melton identified that he believed

---

[3] "Mickey" is also an alias used by Richards.

his legal fees for the drug case were $75,000 to go to trial and $50,000 if he did not go to trial.

Melton informed Pires that Melton had "just" paid "the lawyer" $20,000.  Melton also

aggregated the $25,000 payment to Richards with the cost for his legal representation ("give unc

the 25 I just gave the lawyer 20 so thats 45").  At the time Melton wrote the letter, he was

represented by Attorney Brindley.  Melton further instructed Pires: "tell unc I said for this n***a

to put them motions in, DA said 30 yrs for this [unconfirmed word] …"

## ARGUMENT

I.    **Disqualification in this Case is Appropriate Because the Potential Conflicts of Interest Are Serious and Unwaivable**

The First Circuit has noted:

> The Sixth Amendment guarantees the right to the assistance of counsel in a trial for any serious crime. *Gideon v. Wainwright,* 372 U.S. 335, 343 … (1963). An element of that right is "the right of the defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144 …. (2006). *In evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.*" *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Accordingly, although a defendant may generally waive his Sixth Amendment right to a non-conflicted attorney, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159 … (1988); *see also Morris v. Slappy,* 461 U.S. 1, 13–14 … (1983). Against this background, our review is deferential and the district court has broad latitude. …

*United States v. Alfonzo-Reyes*, 592 F.3d 280, 293–94 (1st Cir. 2010) (emphasis added).

> In *Wheat*, the Court recognized that, in the pretrial context, the relationships between defendants "are seen through a glass, darkly" and the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." … The Court further recognized, "[a] few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of

> explanation to a criminal defendant untutored in the niceties of legal ethics." …
> Therefore, district courts are given "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or not burgeon into an actual conflict as the trial progresses."

*United States v. Chakraverty*, 2025 WL 471196 at *8 (E.D. Mo. Feb. 12, 2025) (citations

omitted).

> The issue of ineffective assistance of counsel for Sixth Amendment purposes manifests itself where the defendant's attorney actively represented conflicted interests. *Holloway v. Arkansas,* 435 U.S. 475, 481–82 … (1978). Such conflicts traditionally arise when an attorney simultaneously represents clients with differing interests (multiple representation) …. *United States v. Shepard,* 675 F.2d 977, 979 (8th Cir.1982). Under circumstances where an attorney is faced with conflicting interests between two clients, continuing to represent one client, even if that client is aware of and waives the conflict, may render his assistance ineffective. *Id.* at 664. Thus, where court is faced with a situation where the attorney's representation of one client may create an actual or potential conflict of interest as a result of his prior representation of another client, it must take adequate steps to ascertain whether the conflict warrants the attorney's disqualification.

*United States v. Lemieux*, 532 F.Supp.2d 225, 229 (D.Mass. 2008).[4]  Citing the Supreme Court

in *Wheat*, the First Circuit has instructed: "'[W]e think the district court must be allowed

substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where

an actual conflict may be demonstrated before trial, but in the more common cases where a

potential for conflict exists *which may or may not burgeon into an actual conflict as the trial*

---

[4] *See also United States v. Zabala-Marti*, 605 F.Supp.2d 337, 344 (D.P.R. 2009)  ("'The Sixth Amendment's right to choose one's own counsel is circumscribed in several important respects.' In *Wheat,* the Supreme Court held 'that the trial court has discretion to disallow a first choice of counsel that would create serious risk of conflict of interest.' … That is because '[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.' . . . In fact, according to the Supreme Court, trial courts have an independent duty to investigate potential conflicts that 'arises in part from the legitimate wish of district courts that their judgments remain intact on appeal.'") (citations omitted).

*progresses ....'" Alfonzo-Reyes*, 592 F.3d at 295 (quoting *Wheat*, 486 U.S. at 163) (emphasis in original).

### A. The Potential Financial Conflict is Not Waivable

Defendant has denied any connection between Richards and the representation of Defendant by Attorney Brindley, who is Richards long-time counsel.  Defendant has denied there was a referral made by Richards.  Moreover, as to the payment of legal fees, Defendant contends that his mother paid for his legal representation solely and Richards had no role whatsoever in payment of legal fees or the representation of Defendant by Attorney Brindley.

Defendant's March 2024 letter to his criminal associate Kareem Pires undercuts these claims, thus raising issues as to a potential serious conflict of interest.  First, in the letter, Defendant tells Pires that ***Defendant*** paid the "lawyer" (Attorney Brindley) $20,000 in March 2024 – not his mother as represented in the affidavits submitted by Defendant.  Second, Defendant noted that he owed $25,000 to Richards ("unc") and then aggregated that $25,000 into the total amount of money needed to be paid for his legal representation in this case.  This aggregation is consistent with Richards having some involvement in the payment of legal fees for Melton.  Moreover, on this point, Defendant instructed Pires to go to Richards to ensure that motions were filed in his case by Attorney Brindley due to Melton's concerns that he was looking at a 30-year sentence.  Third, though the government does not know the billing rates of the defense attorneys on this case, the amount of money ($45,000) paid for Defendant's legal representation (which includes multiple lawyers from Attorney Brindley's firm) in ***both*** this case and the Rhode Island case appears to be unusually low.[5]

---

[5] For example, in a motion for attorneys' fees filed in 2022 in *United States v. McDavid*, Case

Given the above, there are significant questions as to who is paying for Defendant's legal fees which raises a troubling conflict issue.  The First Circuit has noted:

> One such serious potential for conflict occurs when "a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." … The conflict arises because a lawyer could be inclined to "prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest."

*United States v. Laureano-Perez*, 797 F.3d 45, 56 (1st Cir. 2015) (quoting *Wheat*); *see also*

*Garfias v. United States*, 894 F. Supp. 37, 40 (D. Mass. 1995) ("In *Quintero,* the court held that

the petitioner's allegations of a third-party fee arrangement were sufficient to state a claim of an

'actual conflict' under *Cuyler*. … I similarly find Petitioner's allegations in the instant case

sufficient to state a claim of an 'actual conflict' under *Cuyler*.") (citations omitted).  The First

Circuit affirmed the disqualification of defense counsel in *Laureano-Perez* because it found: (1)

there was an obvious conflict of interest, (2) counsel failed to cooperate throughout the hearing

and (3) counsel prevented the defendant from partaking in a colloquy with the court.  *Laureano-*

*Perez*, 797 F.3d at 56.

The Fourth Circuit upheld a disqualification of counsel under similar circumstances:

> Here, the district court disqualified Graysen [the lawyer] based on "a serious potential conflict" arising from "the great likelihood that Mr. Graysen was paid by a third party who is a member of the alleged criminal enterprise." … Certainly, such an arrangement, if it existed, would create a serious potential for conflicts of interest. In *Wood v. Georgia*, the Supreme Court remarked on the "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." 450 U.S. 261, 268–69 …

---

No. 19cr567 (N.D. Ill.), Attorney Brindley stated: "$750 is a reasonable per hour is a reasonable market rate for the services rendered given the undersigned's expertise, level of success, and experience." *See* Ex. 5. If an hourly rate of only $500 were applied in this case, the $45,000 in legal fees would represent a total of 90 billable hours by Attorney Brindley's firm for *both* pending criminal cases, *which are both set for trial in September*.

(1981). Here, the district court anticipated multiple potential conflicts, reasoning that "not only is it possible that Mr. Graysen is acting as an agent of a third party who has interests which are potentially in conflict with those of his client, but this fee arrangement may also discourage Urutyan from considering a plea because more than likely a coconspirator has paid his legal fees." … Further, the district court considered that "the Government may choose to establish the fraud conspiracy by showing the payment of $85,000 in cash to Mr. Graysen, which would result in Mr. Graysen becoming a potential witness against his client." … *Any of these scenarios would pose an unwaivable conflict of interest,* and it was therefore well within the district court's substantial latitude to conclude that Graysen's representation posed a serious potential for conflict of interest. *See Wheat,* 486 U.S. at 164 ….

*United States v. Urutyan*, 564 F.3d 679, 687 (4th Cir. 2009) (citations omitted) (emphasis added).

### B.    <u>The Potential Loyalty Conflict of Interest is Not Waivable</u>

The duty of loyalty is clearly implicated in the related cases involving Melton and Richards – this case and the recently-filed indictment in Case No. 25cr10288-LTS.  These cases are indisputably related.  The issue is whether Attorney Brindley (who has been Richards' counsel for a period of years) can properly satisfy the requirement of undivided loyalty to both defendants in light of the related cases and the potential long sentences of incarceration associated with the cases as discussed at the last hearing.

The Supreme Court has stated:

Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.  For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable.  Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.  Examples can be readily multiplied.

*Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978).

In this case, Richards communicated to Melton that his attorney (Attorney Brindley)

would be involved in representing apprehended conspirators with the hard line that they would

never cooperate.  At the last hearing, Attorney Brindley confirmed that he would not cooperate

individuals and that there had been no plea negotiations engaged in by counsel in this case and

likely would be no plea negotiations in the new case involving Richards and Melton.  Consistent

with *Holloway*, the First Circuit has found that "[w]ith regard to plea agreements, counsel has a

'critical obligation ... to advise the client of "the advantages and disadvantages of a plea

agreement.'"" *Parsley v. United States*, 604 F.3d 667, 671 (1st Cir. 2010) (citations omitted); *see*

*also Newman v. United States*, 162 F.3d 1162, at *2 (6th Cir. 1998) ("A criminal defendant's

interest in securing adequate representation encompasses not only his or her interest in receiving

competent assistance in presenting his or her defense at trial, but also the exploration of possible

plea negotiations on the defendant's behalf.").  On this point, the Supreme Court has noted:

> The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages. Because ours "is for the most part a system of pleas, not a system of trials," …  it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process. "To a large extent ... horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system." … In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.
>
> To note the prevalence of plea bargaining is not to criticize it. The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties. In order that these benefits can be realized, however, criminal defendants require effective counsel during plea negotiations. "Anything less ... might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" …

*Missouri v. Frye*, 566 U.S. 134, 143–44 (2012) (citations omitted) (emphasis in original).

In this area, the Sixth Circuit has stated:

> This Court recognized in *Foltz*, 818 F.2d at 481, the potential problems created by dual representation in connection with plea negotiations. In *Foltz*, the attorney was prevented from effectively engaging in any separate plea negotiations on one party's behalf without detrimentally affecting the co-defendants. *See id.* at 481–82. Foregoing plea negotiations is proof of an actual conflict of interest. *See id.*; *see also Holloway v. Arkansas*, 435 U.S. 475, 490 … (1978) (finding that dual representation may prevent an attorney "from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution").

*United States v. Hall*, 200 F.3d 962, 966 (6th Cir. 2000) (citations omitted).  Reviewing this

potential area of conflict, one district court has noted:

> More apparent is the serious potential for a conflict to arise pre-trial in the course of plea bargaining. Conflict-free counsel acting for either defendant … would have a strong incentive on behalf of his client to seek a plea bargain that would minimize potential jail time in return for cooperation against other defendants. Yet, such a plea bargain, by requiring the pleading defendant to maximize his or her cooperation with the government, would likely require that defendant to implicate [the attorney's] other client. Indeed, courts have recognized that joint representation of conflicting interests is suspect for Sixth Amendment purposes precisely because it might prevent an attorney from exploring fully the opportunity for plea negotiations.  In this case, defendants argue that no potential conflict exists because … [counsel] has previously inquired of the government regarding a possible plea bargain for [one of the defendants], but was rebuffed. While this is no doubt true, it is, in the context of the course of criminal trials, ancient history; the government might well change its mind at any moment. And moreover, conflict-free counsel, acting on behalf of [the defendant], might be instrumental in persuading the government to change its mind.

*United States v. Balsirov*, 2005 WL 1185810 at *4 (E.D. Va. May 18, 2005). Similarly, one

district court has noted:

> … *[The defense attorney] had made no real effort to explore Defendant's potential for a plea agreement or to cooperate with the Government. … This, in itself, is strong evidence of a conflict. United States v. Hall,* 200 F.3d 962, 965 (6th Cir.2000) ("Foregoing plea negotiations is proof of an actual conflict.") "Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest." *United States v. McLain,* 823 F.2d 1457, 1464 (11th Cir.1987) (citing *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 55

L.Ed.2d 426 (1978)); *see also Newman v. United States,* 1998 WL 553048, at *3 (6th Cir.1998); *Mannhalt v. Reed,* 847 F.2d 576, 582 (9th Cir.1988); *United States v. Lopez,* 989 F.2d 1032, 1043, amended and superseded by *United States v. Lopez,* 4 F.3d 1455 (9th Cir.1993); *United States v. Balsirov,* 2005 WL 1185810 (E.D.Va.2005); *United States v. Tatum,* 943 F.2d 370, 376 (4th Cir.1991**).** *Fulfilling this obligation requires more than simply sitting back and waiting to see what the Government offers.*

*United States v. Almany*, 621 F. Supp. 2d 561, 570 (E.D. Tenn. 2008) (emphasis added).

The issue of plea negotiations is just one of the many problems arising out of the conflicted duty of loyalty raised by the representation of Melton by Attorney Brindley in this case and Attorney Brindley's representation of Richards in the new case. As the Supreme Court warned in *Holloway*, "in a case of joint representation of conflicting interests the evil - it bears repeating - is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. *Holloway*, 435 U.S. at 490 (emphasis in original). The clear conflicting loyalties of Attorney Brindley (especially taking into account his long-standing relationship with Richards) raises a potential conflict of interest which unwaivable as is the conflict associated with the payment of legal fees.

11

## CONCLUSION

Given the above, disqualification is the appropriate resolution of the conflict issues because the conflicts of interest inherent in the representation of both Richards and Melton by Attorney Brindley are unwaivable.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date: July 10, 2025

By: */s/ Michael Crowley*
MICHAEL CROWLEY
SAMUEL R. FELDMAN
Assistant U.S. Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Crowley, Assistant United States Attorney, do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael Crowley*
MICHAEL CROWLEY
Assistant U.S. Attorney