UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     Criminal No. 22-10356-LTS-2 |
| | ) |
| ELIJAH MELTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON DISQUALIFICATION OF ATTORNEY BRINDLEY

August 11, 2025

SOROKIN, J.

The United States requested a hearing to determine whether defendant Elijah Melton's retained attorney Beau Brindley should be disqualified in this case due, at least in part, to his prior and current representation of Theodore Richards, Melton's co-defendant in a separate criminal case also pending before the Court.[1]  The Court received multiple briefs and related submissions from each party and held two hearings—one on June 24, 2025, and another on July 16, 2025, after Melton had consulted with appointed conflicts counsel.  For the reasons that follow, Attorney Brindley is disqualified from further representation of Melton in this case.

I.    BACKGROUND[2]

   A.    Richards's History

The relevant history begins with Richards.  In November 1998, Richards was convicted in federal court in California of conspiring to distribute cocaine base and sentenced to 168

---

[1] The government separately moved to disqualify Brindley from representing Richards in the case in which Richards and Melton are co-defendants.  That motion remains under advisement and will be the subject of a separate order.

[2] Except where noted with language such as "allegedly" or "according to," the Court finds the following facts by a preponderance of the evidence.  See Doc. No. 219 at 1 (reflecting

months in prison.  Doc. No. 183-1 ¶ 9.[3]  The next year, Richards was convicted in California state court of assault with a firearm; he was sentenced to a term of four years in prison, set to run concurrently with his federal sentence.  Id.  The Bureau of Prisons released Richards in 2008 when he completed those sentences.  Id.

Richards was arrested again in November 2010, this time for carrying a bag containing roughly ten kilograms of cocaine.  Id.  That arrest led to a conviction two years later in the U.S. District Court for the Northern District of Illinois for possession with intent to distribute cocaine. Id.  For this, his second federal drug conviction, Richard was sentenced to 300 months in prison. Id.  Richards appealed, represented by Attorney Brindley—a criminal lawyer based in Chicago— and the Seventh Circuit vacated his conviction in 2013, remanding for a new trial.  United States v. Richards, 719 F.3d 746 (7th Cir. 2013).  The ensuing retrial, with Attorney Brindley continuing to represent Richards, ended with a jury acquitting Richards.  Doc. No. 183-1 ¶ 9. Across his federal cases, Richards served about fourteen years in prison.  Id.

B.    Melton's 2022 Drug Activities[4]

Jumping forward in time, a confidential informant ("CI") working for the government made a series of recorded calls to Melton in late 2022.  In the course of these calls, the CI arranged to purchase four kilograms of fentanyl.  In December 2022, Samuel Fonseca—allegedly acting as Melton's delivery person, and Melton's co-defendant in this case—was arrested on his way to deliver fentanyl that, per the government, was the focus of the deal the CI had negotiated

---

defendant's acknowledgement that preponderance-of-the-evidence standard applies); Doc. No. 229 at 1 (reflecting government's agreement as to standard).

[3] Citations to "Doc. No. __" refer to documents appearing on the Court's electronic docketing system ("ECF") in this case; pincites are to the page numbers in the ECF header or to the paragraph numbers used by the document in question.

[4] The facts in this section derive from descriptions of evidence provided by the government, which the Court accepts for purposes of this motion.

with Melton.  Agents found four kilograms of fentanyl in Fonseca's car.  Doc. No. 4-1.  Fonseca

was charged in a sealed complaint on December 8, 2022, marking the start of this criminal case.

Doc. No. 4.

Melton was not then arrested or charged.  Rather, he was brought into the case a year

later, via a superseding indictment filed in December 2023.  Doc. No. 52.  The two charges

against Melton and Fonseca arise from the government's allegation that Melton conspired with

Fonseca to distribute fentanyl by communicating with the CI and arranging for the delivery

Fonseca was undertaking at the time of his arrest.  Id.; Mot. Hr'g, Rough Tr. at 9 (July 16, 2025).

     C.   Melton's 2023 Messages with "James Jackson"

By the fall of 2023, Melton was using the "Session" application to communicate with a

person who called himself "James Jackson."  Doc. No. 183-1 ¶ 12.[5]  Over the course of roughly

three months—September 20, 2023, to December 8, 2023—"Jackson" and Melton exchanged

messages which, according to the government, show the two men negotiating, arranging, and

documenting bulk shipments of cocaine, fentanyl, and marijuana from "Jackson" in California to

Melton for redistribution in Massachusetts.  Doc. No. 183-1 ¶ 29.  For example, on October 20,

2023, "Jackson" sent Melton two pictures; one appears to show thirty-two kilograms of cocaine,

and the other two kilograms of fentanyl.  Id. ¶ 36.  "Jackson" then stated he would be sending

Melton "[f]our of those boys," referring to kilograms of fentanyl as "boys," and "at least 32

girls," referring to kilograms of cocaine as "girls."  Id. ¶ 37.  These drugs were to be shipped in

four containers, with each containing one kilogram of fentanyl and eight kilograms of cocaine.

Id. ¶ 42.  This was, per "Jackson," the first shipment he was sending to Melton and would "only

be the start."  Id. ¶ 38.  On October 29, 2023, Melton confirmed his receipt of this shipment.  Id.

_____

[5] The government obtained these messages by searching, pursuant to a warrant, a cell phone
recovered from Melton's home at the time of his arrest.  Doc. No. 183-1 ¶¶ 10, 12.

¶ 49.  Initially, "Jackson" was charging $40,000 to $50,000 per kilogram of fentanyl and $16,500 per kilogram of cocaine.  Id. ¶ 46.  Melton later pushed for discounts, and the record suggests he eventually obtained them.  See id. ¶ 37 (identifying "mickeys" and "boys" as slang for fentanyl); Doc. No. 221-3 at 2 (reflecting agreement by "Jackson" "to do" "Mickeys" "at 30"); Doc. No. 221-5 at 3 (using "30" and "16" as multipliers in calculating wholesale costs of drugs).

The government contends—and the Court finds by a preponderance of the evidence— that "James Jackson" is Theodore Richards.[6]  This finding arises from the following series of facts and inferences arising from the government's evidentiary submissions.

On November 24, 2023, "Jackson" sent Melton a photo purporting to be himself and his daughter; the man in the photo is Richards.  Id. ¶ 14.  Throughout his conversations with Melton, "Jackson" described his criminal history in a way that matched Richards's criminal history as the Court has described it above.  Id. ¶ 15.  On October 24, 2023, "Jackson" invited Melton to California for two parties: one for his girlfriend on December 2, and another for his sister in January.  Id. ¶ 17.  A woman identified by investigators as Richards's girlfriend has a birthday of December 2.  Id. ¶ 21.  On the night of the event for "Jackson's" girlfriend, Melton uploaded a series of videos to snapchat.  One shows a party, with a man resembling Richards visible at one point.  Id. ¶ 26.  Per the location data for the videos, they were taken at 340 E McKee Road in Bakersfield, California.  Id. ¶ 25.  According to investigators, another pair of videos Melton also uploaded that night show features of areas outside the property that match 340 E McKee Road. Id. ¶ 28.

---

[6] Because the phone containing these messages was recovered from Melton's home, the Court also finds that the person exchanging these messages with "Jackson" was Melton.

"Jackson" later described 340 E McKee Road to Melton as his "compound."  Id. ¶ 21.
That property is owned by a woman associated with Richards, and Richards has stated in prior
testimony that he paid for it.  Id. ¶ 21.  In January 2025, investigators surveilling this address saw
Richards entering the residence.  Id. ¶ 22.  They also saw an individual there whom they
identified as Edward Cook.  Id. ¶¶ 23–24.  Cook was charged with murder in 1994 at the age of
sixteen, was convicted in 1995, served twenty-eight years in prison, and was paroled on October
24, 2023.  People v. Cook, 72 Cal. Rptr. 2d 183 (Cal. Ct. App. 1998).  On October 25, 2023,
"Jackson" messaged Melton about seeing a friend who had "killed a lot of people when he was
16" and had just been released from prison after thirty years.  Doc. No. 183-1 ¶ 24.  From all
this, the Court infers "Jackson" was describing Cook, who was seen at Richards's residence in
2025—the same residence that was the site of the party Melton attended for "Jackson's" girl, at
which Richards was present, and which occurred on Richards's girlfriend's birthday.  Taken
together, these circumstances convince the Court that Melton not only knew Richards but was
speaking to Richards when he was messaging "James Jackson."

The government also contends—and the Court finds—that the messages between Melton
and Richards (as "Jackson") contained references to Attorney Brindley.  Early in their
communications, around September 23, 2023, Richards told Melton: "Also, everything with me
comes with a protection safety.  A guarantee you'll never go to jail f[***]ing with me my outfit.
Don't tell ever we do not cooperate."[7]  Id. ¶ 16.  Later, Richards wrote that his "drivers" are
"tight," and that "everybody has my lawyer and we never talk.  We never cooperate."  Id.  On
October 24, 2023, Richards wrote:

---

[7] Where the Court quotes these messages, as well as the letter described in Section I(E), infra, it
does so verbatim except where bracketed words or characters indicate otherwise.

> I've been to the Feds twice I have 14 years total Fed time under my belt.  I was a law library clerk for 10 years and I've been studying law for over 20 years and I work closely with a law firm out of Chicago, so please tap my knowledge I've done enough Fed time for the both of us if you pay attention and listen to me, you're not going to ever have to do any!!!!!

Id. ¶ 15.  These statements, and subsequent events, support a finding by a preponderance of the evidence that the lawyer Richards referred to as "my lawyer" was Attorney Brindley, and the law firm he said he "work[s] closely with" was Brindley's firm.  Attorney Brindley's law office is in Chicago.  He has a policy against representing cooperators, and he successfully represented Richards on an appeal and retrial that spared Richards a twenty-five-year sentence.[8]

>    D.    The Present Case

Shortly after Melton travelled to California for the December 2 party, the government brought a superseding indictment in this case charging Melton alongside Fonseca with conspiracy to distribute fentanyl, as well as distribution and possession with intent to distribute fentanyl.  Doc. No. 52.  Melton was arrested on these charges on December 12.  Doc. No. 59.  That day, Melton filled out a financial affidavit stating that he did not have a job, did not own any property, and did not have any money in savings or checking accounts.  Doc. No. 62.  Accordingly, Melton was appointed counsel.  Doc. No. 61.  And on December 21, 2023, Melton was released on conditions.  Doc. No. 68.

On February 16, 2024, Melton filed a motion to substitute Attorney Brindley for his appointed counsel.  Doc. No. 84.  The Court allowed that motion, Doc. No. 85, and Attorney

---

[8] The conclusion that Richards's statements referenced Attorney Brindley is also corroborated by testimony the government represents Richards gave around December 20, 2021, in which he referred to Attorney Brindley as "my lawyer" and attested to his strong relationship with Attorney Brindley's firm.  Doc. No. 183-1 ¶ 16.  Neither Melton nor Brindley have disputed these representations.  In fact, Attorney Brindley's own comments to the Court during recent hearings regarding his conflicts in this case and the related case where Richards and Melton are co-defendants have confirmed the length and depth of his relationship with Richards.

Brindley entered his appearance for Melton on March 4, 2024, Doc. No. 97.  From the messages Richards sent Melton referring to Attorney Brindley as "my"—meaning Richards's—"lawyer," and the fact that Attorney Brindley had never appeared in the District of Massachusetts before this case, the Court infers that Richards referred Melton to Attorney Brindley.

Attorney Brindley's fees for representing Melton (in both this case and the tampering case discussed below) have been paid by Melton's mother.  See generally Doc. No. 218-1.  She has made three payments to Brindley: $20,000 by cashier's check on March 13, 2024; $20,000 by cashier's check on July 10, 2024; and another $5,000 by personal check on July 10, 2024.  Doc. No. 218-2.[9]  According to both Attorney Brindley and Melton's mother, no other person has paid or promised to pay for Attorney Brindley's representation of Melton.  Doc. No. 218-1 ¶ 5; Doc. No. 218-3 ¶¶ 2–3.

E.    Melton's March 2024 Letter

On March 13, 2024, the same day Melton's mother made her first payment to Attorney Brindley, Melton's pre-trial release was revoked.  Doc. No. 86; Doc. No. 112.  A few days later, around March 18, Melton wrote a letter from jail to Kareem Pires, an alleged associate in his drug operations who was present with Melton at the December 2 party in California, Doc. No. 183-1 ¶ 26, and is his co-defendant in the tampering case described in the next section.[10]  See Doc. No. 244.  In the letter, Melton told Pires: "This is so you know whats going on with unc

_____

[9] The July 9, 2025, affidavit attesting to these facts contains an apparent typographical error as to the year of the third payment.  Compare Doc. No. 218-1 ¶ 4 (stating payment made July 10, 2025), with Doc. No. 218-2 at 3 (providing copy of check dated July 10, 2024).

[10] Records the government have submitted establish, by a preponderance of evidence, that Melton gave this letter to a person who was incarcerated with him at the time and (unbeknownst to Melton) was a confidential source cooperating with investigators in this case.  Doc. No. 252 at 3; see Doc. No. 244.  The March letter was never delivered to Pires; Melton replaced it with a new letter a month later, which the same source did eventually deliver to Pires after sharing it with investigators.  Doc. No. 252 at 6; see Doc. Nos. 244, 246-2.

40x16 = 640  5x30 = 150  plus old tab was 45." Doc. No. 221-5 at 3.  Melton then referenced

"the 25k I was supposed to give to unc," and said "give unc the 25 I just gave the lawyer 20 so

thats 45  75 if I go to hoop  50 if I dont." Id.  Melton then instructed Pires, "tell unc I said for

this n[****] to put them f[***]ing motions in, DA said 30 yrs for this." Id.  Later, Melton wrote:

"Tell my peoples too I said no more $ for lawyer until he start doing shit n[****] just came on

docket day I had court been gave him that 2 month before." Id. at 4.

     The Court finds that the "unc" referred to in this letter was Richards, and the "lawyer"

was Attorney Brindley.  Several points support this finding.  First, Melton called Richards

"uncle" in a text on October 20, 2023, several months before the letter was written.  Doc. No.

221-1 at 3.  This is not dispositive, as "uncle" (or "unc," for short) is a common nickname, but it

shows that Melton did refer to Richards as such.

     Second, the calculations line up with the drug quantities Richards was sending Melton,

per their messages.  In each calculation, Melton was explaining what amounts were owed to

Richards by multiplying the number of kilograms of each drug by the per-kilogram price of each

drug.  Richards's first shipment contained four kilograms of fentanyl and thirty-two kilograms of

cocaine.  The shipment came in four containers, each containing one kilogram of fentanyl and

eight kilograms of cocaine.  The Court infers that Richards later sent an additional container,

similarly containing one kilogram of fentanyl and eight kilograms of cocaine, bringing the total

to the five kilograms and forty kilograms referenced in the mathematical equations Melton

included at the start of his letter.  As far as cost is concerned, fentanyl was initially priced at

$40,000 to $50,000 per kilogram, but the Court infers Melton secured a discounted price of

$30,000 per kilogram in November 2023.  See Doc. No. 221-3 at 2 (reflecting Richards's

confirmation that he could "do [Mickeys, i.e. fentanyl] at 30").  And cocaine was initially priced

at $16,500 per kilogram, which it is reasonable in these circumstances to infer was rounded down or reduced to the "16" Melton used in his calculations.

Third, Attorney Brindley began representing Melton when his release was revoked shortly before this letter was sent, and the statement about having "just" given "the lawyer 20" is consistent with Melton's mother's $20,000 payment to Attorney Brindley five days earlier. Finally, Melton's instruction to "tell unc" that Melton wants someone "to put them motions in" is necessarily a direction ultimately aimed at Attorney Brindley. Only Brindley, the lawyer representing Melton in the sole case he faced at the time and the reason for his then-recent detention, would file motions on his behalf. Moreover, as the Court already has explained, Attorney Brindley was Richards's longtime lawyer, and Richards had referred Melton to him. In that context, it is reasonable to infer that Melton, apparently unhappy due to his perception that Brindley was not "doing shit" in the case, would reach out to Richards with the expectation that he (Richards) would (more effectively than Melton) direct Brindley to take a more active approach to litigating on Melton's behalf.

Ultimately, while "unc" could theoretically refer to someone else, the Court finds it is more likely than not on this record that it referred to Richards—whom Melton had called "uncle" in at least one other instance, and the only person to whom Melton owed money and Attorney Brindley had relevant ties. Therefore, the preponderance of the evidence suggests that "unc" referred to Richards and the "lawyer" referred to Attorney Brindley.[11]

_____

[11] The government also reads the letter as describing a $45,000 aggregate payment of some sort by Melton, combining $25,000 owed to Richards with the $20,000 payment to Attorney Brindley. That is not the only plausible reading of the relevant sentence. One could understand "give unc the 25 I just gave the lawyer 20 so thats 45" as Melton simply totaling the sums that had been or must be paid from his drug proceeds to any source. However, the letter's other references to Attorney Brindley—especially the one suggesting Melton believed that communicating requests to Richards would yield action by Brindley—might support a different

F.     The Tampering Case

Meanwhile, between late February and late April 2024, Melton allegedly engaged in conduct that led to a second federal criminal case against him. While incarcerated after revocation of his pretrial in this case, Melton allegedly conspired with Pires to arrange for the murder of three persons connected to the present charges: a witness before the grand jury (presumably, the confidential informant), and two Assistant United States Attorneys. United States v. Melton, No. 24-CR-00059 (D.R.I. filed June 26, 2024) [hereinafter Melton II]. On June 26, 2024, a grand jury in the U.S. District Court for the District of Rhode Island indicted Elijah Melton and Kareem Pires on five counts related to this alleged conspiracy. Indictment, Melton II, Doc. No. 1. Attorney Brindley appeared for Melton on July 8, attended his arraignment days later, and has represented him for the entirety of Melton II.

G.     The Richards Conspiracy Case

On April 23, 2025, seemingly in large part based on the text messages discovered during the post-arrest search of Melton's phone, the government brought a third case against Melton. Initially filed as a sealed complaint, the new case charged Melton and Richards with conspiracy to distribute and to possess with intent to distribute fentanyl and cocaine, and it was based, in part, on the messages between Melton and "James Jackson." United States v. Melton, No. 25-CR-10288 (D. Mass. filed Apr. 23, 2025) [hereinafter Melton III]. That complaint was initially assigned to Magistrate Judge Donald L. Cabell but was later assigned to this Session after the

---

inference. That is, because Melton viewed Richards as a conduit of information he intended to reach Brindley, he might also have viewed Richards as a conduit of fee payments meant for Brindley. In that case, one could infer that Melton expected "the 25" he said Pires should "give unc" would be transmitted by Richards to "the lawyer," bringing Melton's total payment to Brindley for his representation in this case up to "45." Before drawing the inference suggested by the government, the Court would also have to consider the affidavits Melton submitted from his mother and Brindley explaining the source of the funds for the attorney's fees. For present purposes, the Court need not definitively resolve this question.

government filed an indictment against Melton and Richards on July 9.  Elec. Notice, Melton III,

Doc. No. 1; Elec. Notice, Melton III, Doc. No. 23.

On May 13, 2025, Richards was arrested in Chicago on the Melton III complaint.  United

States v. Richards, No. 25-CR-00263-1 (N.D. Ill. terminated May 22, 2025); see Mot. Unseal,

Melton III, Doc. No. 6 (notifying D. Mass. of Richards's arrest via motion filed after 4:00 PM on

May 13).  The next day, in an initial appearance before the U.S. District Court for the Northern

District of Illinois, Attorney Brindley represented Richards.  Order, Richards, No. 25-CR-00263-

1 (N.D. Ill. entered May 14, 2025), Doc. No. 3.  Attorney Brindley did not enter an appearance

for Melton in Melton III and has disclaimed any interest in doing so.  Doc. No. 189 at 2.[12]  As a

result, Attorney Brindley represents Melton in the present case and Melton II—neither of which

involve Richards.  But in Melton III, Attorney Brindley does not represent Melton and, instead,

represents his co-defendant, Richards.  When he appeared for Richards in Melton III, Attorney

Brindley did not file—and does not contend he had then obtained—written waivers to any

resulting conflicts of interest signed by Richards or Melton.[13]  Melton has since been appointed a

---

[12] Attorney Brindley and Melton both framed this as Melton's choice.  However, the Court does
not credit their assertions on this point.  When pressed at a hearing, Attorney Brindley conceded
that the potential conflict-of-interest issues arising from his prospective representation of
Richards and Melton in the same case contributed to the decision not to represent Melton.  In
addition, Melton chose to have Attorney Brindley represent him in his only other federal
criminal cases (the present case and Melton II), and he did not assert that he lacks funds to hire a
lawyer in Melton III (indeed, at the outset he expressed an intent to retain counsel in that case).
These facts, especially considered alongside evidence before the Court reflecting statements by
both Richards and Melton that they viewed Attorney Brindley as Richards's lawyer, render
implausible the suggestion that it was purely a matter of Melton's choice not to retain Attorney
Brindley in Melton III.
[13] Attorney Brindley has suggested that he spoke to Melton and received an oral waiver before he
appeared for Richards.  The window within which any such conversation could have possibly
occurred is exceedingly narrow, as less than twenty-four hours elapsed between the time
Richards's May 13 arrest and his initial appearance in Illinois on May 14.  Of course, at that
time, Melton was detained in a facility in New England, while Brindley was in Chicago.  This
tight timeline with the related logistics alone is reason to question whether a meaningful

lawyer, Keith Halpern, in Melton III.  At first, Attorney Halpern was appointed to represent

Melton until he retained counsel, Elec. Order, Melton III, Doc. No. 29, though Attorney Halpern

stated during a recent hearing on the conflicts motion that he anticipates continuing his

representation of Melton for the duration of the matter.

      H.    Conflicts Proceedings

On May 16, 2025, the government filed in this case a motion seeking a hearing on the

potential conflicts of interest arising from Attorney Brindley's concurrent representation of

Melton in this case and Richards in Melton III.[14]  Doc. No. 183.  The Court ordered Attorney

Brindley to file a response to the government's motion by May 30, 2025, and to certify that he

had provided to Melton a copy of the government's motions and exhibits, as well as the Court's

electronic orders on the related briefing schedule.  Doc. No. 187.  Attorney Brindley filed his

response on May 30 but failed to make the ordered certification.  Doc. No. 189.  Only after the

Court again directed him to do so did Attorney Brindley certify that he had provided the required

documents to Melton.  Doc. Nos. 190, 197.  Attorney Brindley subsequently stated that Melton

had asked to sign a written conflict waiver, but, out of an abundance of caution, Attorney

Brindley had advised him to review the waiver form with his counsel in Melton III.  Doc. No.

198 at 10 n.3.  Attorney Brindley did file a signed waiver form from Richards at that time.  Doc.

No. 199.  There is no indication Richards reviewed the form with independent counsel before

---

discussion about the conflict and its associated risks could have transpired and enabled Melton to
provide any form of waiver that was both informed and voluntary.

[14] That same day, the government filed a nearly identical motion in Melton III.  Mot. Hr'g
Potential Conflicts, Melton III, Doc. No. 11.  The Court held a hearing on that motion on July 16,
2025, at which it appointed Attorney John Cunha to independently advise Richards as to the
potential and actual conflicts of interest created by Attorney Brindley's representation.  That
motion remains under advisement.

signing, and Attorney Brindley later conceded that he was the one who prepared and reviewed the form with Richards.

The Court held a hearing on the government's motion on June 24.  At the hearing, Attorney Brindley provided the Court with a waiver form signed by Melton.  Doc. No. 209.  That form is nearly identical to the one signed by Richards.  Up to that point—and for at least three weeks afterward—no attorney had entered an appearance for Melton in <u>Melton III</u>.  <u>See</u> Minute Entry, <u>Melton III</u>, Doc. No. 28 (reflecting Melton "expect[ed] to retain counsel in the next few days"); Elec. Order, <u>Melton III</u>, Doc. No. 29 (appointing counsel for Melton on July 11 "provisionally" and "in the interim" until entry of retained counsel).  Attorney Brindley did not indicate at the hearing whether Melton had reviewed this waiver form with independent counsel, and he later conceded that he had also been the one to prepare and review this form with Melton.

Attorney Brindley also represented at that hearing that he adheres to a policy of not representing defendants who wish to enter cooperation agreements with the government.  He explained that he will advise such a client on the merits and demerits of cooperation, then inform the client that he will not represent her if she chooses to cooperate.

Ultimately, the Court appointed David Grimaldi to advise Melton in the present case on Attorney Brindley's potential conflicts of interest.  To give Attorney Grimaldi time to familiarize himself with the case and consult with Melton, the Court set a further hearing for July 16 and ordered supplemental briefing on questions the Court identified.  Doc. No. 211 at 2–5.

At the July 16 hearing, Attorney Grimaldi reported that he believed Attorney Brindley's concurrent representation of Melton and Richards did raise conflicts of interest, that he had discussed these conflicts with Melton, and that Melton wished to waive those conflicts.  The Court then conducted a colloquy with Melton, in which he knowingly and voluntarily waived his

right to conflict-free counsel. Melton also affirmed that he had no desire to enter a plea or cooperation agreement at any point. Because the government has not yet produced discovery in Melton III, Melton has not reviewed the evidence against him in that case or discussed it with any lawyer. His consultation with Attorney Grimaldi and his colloquy with the Court, therefore, occurred without accounting for whether any specific information the government might later disclose in Melton III materially alters the conflicts analysis in this case. In any event, after receiving post-hearing briefs from the parties, the Court is ready to resolve the government's motion.

## II.    LEGAL STANDARDS

The Sixth Amendment to the United States Constitution guarantees to each criminal defendant "the Assistance of Counsel for his defence." U.S. Const. amend. VI. This includes "the right to select and be represented by one's preferred attorney." Wheat v. United States, 486 U.S. 153, 159 (1988). However, this right is not absolute. "The essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id. (citation modified). Therefore, a defendant's right to choose his own attorney may be limited where there is a "realistic potential for a conflict of interest," such that the defendant's chosen attorney may be unable to render effective assistance of counsel. United States v. Laureano-Perez, 797 F.3d 45, 56 (1st Cir. 2015). That is, a defendant's "right to have an attorney of [his] own choosing," id. at 55, may be limited by his "right to have counsel without any conflict," United States v. Abdelaziz, No. 19-cr-10080-NMG, 2020 WL 618697, at *2 (D. Mass. Feb. 10, 2020) (citing United States v. Ponzo, 853 F.3d 558, 574 (1st Cir. 2017)).

Whether a conflict exists is a question governed by the jurisdiction-specific ethical rules that bind lawyers. Pursuant to the Massachusetts Rules of Professional Conduct, a concurrent

conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Mass. R. Prof'l Conduct 1.7(a)(2).[15]  A lawyer may represent a client under such circumstances only if: (1) "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client"; (2) "the representation is not prohibited by law"; (3) "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal"; and (4) "each affected client gives informed consent, confirmed in writing." Mass. R. Prof'l Conduct 1.7(b).

A defendant may waive his right to unconflicted counsel if "the waiver is knowing and voluntary," the conflict "is not so severe" as to become unethical, and "the circumstances are such that 'legal proceedings appear fair to all who observe them.'" Abdelaziz, 2020 WL 618697, at *2 (quoting Wheat, 486 U.S. at 160). In considering a defendant's waiver, a district court must observe "a presumption in favor of [the defendant's] counsel of choice." Wheat, 486 U.S. at 164. However, this presumption may be overcome "not only in those rare cases where an actual conflict may be demonstrated before trial, but also in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Laureano-Perez, 797 F.3d at 56 (citation modified); see also Wheat, 486 U.S. at 164 (explain presumption "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict"). Even where all impacted defendants provide waivers, "federal courts have an independent interest in ensuring that criminal trials are

---

[15] Per Local Rule 83.6.1, "[t]he rules of professional conduct for attorneys appearing and practicing before this Court shall be the Massachusetts Rules of Professional Conduct."

conducted within the ethical standards of the profession"—as well as a duty to safeguard "the institutional interest in the rendition of just verdicts in criminal cases," which is "jeopardized by unregulated multiple representation." Wheat, 486 U.S. at 160.

To safeguard a defendant's right to conflict-free representation, a court must take special precautions when an attorney seeks to represent co-defendants. Under such circumstances, district courts within the First Circuit must hold a hearing "as early in the litigation as practicable, . . . to insure that defendants are aware of [the] risks [of joint representation], and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or . . . have such counsel appointed by the court." United States v. Foster, 469 F.2d 1, 5 (1st Cir. 1972); see also Fed. R. Crim. P. 44(c)(2) ("The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation.").

Where a court suspects that an actual conflict or a serious potential for conflict exists, it "has broad latitude to determine when disqualification is required." United States v. Arias, 351 F. Supp. 3d 198, 200 (D. Mass. 2019) (quotations omitted). "The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." Wheat, 486 U.S. at 164. Still, "attorney disqualification is a drastic remedy that "should be a measure of last resort." Abdelaziz, 2020 WL 618697, at *2.

III.    DISCUSSION

The primary set of potential conflicts here relate to Attorney Brindley's simultaneous representation of Melton in this case and Richards in Melton III.[16] The Court finds that this

---

[16] The government also argued that a potential conflict arises from Attorney Brindley's fees for representing Melton. However, the Court finds no disqualifying conflict here, because there is

simultaneous representation presents a serious potential of unwaivable conflicts and so disqualifies Attorney Brindley from acting as Melton's counsel in this case.  More specifically, the Court finds that this case indeed presents a potential for serious concurrent conflicts between Attorney Brindley's duties to Melton in this case and to Richards in Melton III.  Attorney Brindley's preexisting relationship with, and current responsibilities to, Richards create a significant risk of materially limiting his representation of Melton and undermining the integrity of the criminal trial in this case.

The Court reaches this conclusion based upon a series of interrelated reasons which, taken together, warrant the disqualification of retained counsel of Melton's choice.  In applying the governing standards described above, the Court first addresses the suggestion that Attorney Brindley's representations regarding the existence or potential for conflicts to arise are entitled to "substantial weight," Doc. No. 189 at 6 (quoting United States v. Flynn, 87 F.3d 996, 1001 (8th Cir. 1996)), before explaining the basis for its decision to disqualify Brindley here.

A.    Attorney Brindley's Credibility

In his filings on behalf of Melton, Attorney Brindley encourages the Court to limit its own evaluation of the potential conflicts the government raises and, instead, defer to his assurances that he does not expect such conflicts to come to fruition—or, if they do arise, he

---

no clear evidence of impropriety in Attorney Brindley's payment.  Though Melton is not directly paying Brindley, the record does not support a finding that Richards is making the payments, as the government contends.  (If there were evidence supporting such a finding, it would almost certainly warrant disqualification.  See Laureano-Perez, 797 F.3d at 56.)  Attorney Brindley has produced affidavits from himself and Melton's mother, along with copies of checks Melton's mother has paid to him.  Doc. No. 218-1 to -3.  The government has offered no evidence rebutting this showing or suggesting it establishes deviation by Attorney Brindley from the ethical rules governing fees.  Although the Court believes Richards referred Melton to Brindley and concludes below that Richards in some way has controlled Attorney Brindley's representation of Melton, there is not enough support in the record to find that Richards also paid for Attorney Brindley.  Therefore, the Court finds that the government has failed to establish a conflict of interest arising from Attorney Brindley's fees.

does not anticipate them impairing his ability to effectively represent both Melton in this case and Richards in <u>Melton III</u>.  Brindley urges that he "is in the best position professionally and ethically" to assess such questions.  Doc. No. 198 at 5 (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 347 (1980) (citation modified)).  The Court declines to defer to Attorney Brindley here, though, based on actions he has taken in this and past cases that undermine his credibility and the Court's faith in his assessment of the pivotal conflict questions.

In this case, Attorney Brindley did not obtain—but undeniably should have obtained—informed written consent from <u>both</u> Melton and Richards <u>before</u> he entered an appearance for Richards in <u>Melton III</u>.  <u>See</u> Mass. R. Prof'l Conduct 1.7 cmt. 3 (requiring attorney to decline representation that poses potential conflict "unless the lawyer [first] obtains the informed [written] consent of each client").  When he entered his appearance for Richards in <u>Melton III</u>, he knew he was already representing Richards's co-defendant (Melton) in another pending case.  Attorney Brindley's failure to obtain the necessary waivers in these circumstances suggests he was not taking seriously the obvious potential conflicts.[17]

Then, when the government raised the conflicts issue, Attorney Brindley assured the Court that Melton would review a written conflict waiver with independent counsel.  But he did not follow through on that promise.  He did not obtain independent counsel to advise Melton (or, for that matter, Richards) regarding the potential conflicts.  Instead, Attorney Brindley prepared a waiver and reviewed it with Melton himself, before even receiving discovery in <u>Melton III</u>.

---

[17] The potential conflicts arising from his existing representation of Melton and his appearance for Richards in the new case were patently obvious to Attorney Brindley.  Nevertheless, when he appeared for Richards at the initial appearance, Brindley did not explain to the magistrate judge that he also represented Melton in other pending criminal cases.  Nor did he request permission to provisionally represent Richards for the detention hearing only, while he obtained the written consents necessary to permit any concurrent representation to continue.

Although the use of independent counsel in such situations is not strictly required by the Rules, it would have demonstrated respect for the gravity of the situation (and honored a statement he made to the Court). Attorney Brindley's failure to certify that he provided Melton with documents related to the conflicts motion further undermines his reliability in this regard.

This Court is not the first to question the credibility of assertions by Attorney Brindley in federal criminal cases. A federal judge in Illinois once held Attorney Brindley in contempt for making false statements regarding his schedule, though the Seventh Circuit later vacated the order of contempt. United States v. Britton, 731 F.3d 745 (7th Cir. 2013). A year later, the Seventh Circuit rebuked and fined Attorney Brindley for intentionally failing to comply with a circuit rule, in the process questioning whether Attorney Brindley was being candid about the reason for his noncompliance. United States v. Johnson, 745 F.3d 227, 230–32 (7th Cir. 2014). A federal judge in the Eastern District of Wisconsin, commenting on Attorney Brindley's repeated last-minute requests for continuances and detailing conduct across numerous cases that raised "concerns about gamesmanship," noted its suspicions that "Attorney Brindley has abused the system and . . . has been less than candid with this court and possibly others." United States v. Hofschulz, No. 18-cr-145, 2020 WL 832899, at *15, *25 (E.D. Wisc. Feb. 20, 2020).

Moreover, multiple other courts have disqualified Attorney Brindley (and his co-counsel in this case) on conflicts grounds. See United States v. Chakraverty, No. 4:24CR489 MTS/SPM, 2025 WL 471196, at *9 (E.D. Mo. Feb. 12, 2025) (disqualifying Brindley where he had previously represented potential government witnesses and co-defendant but "attempted to downplay conflicts"); United States v. Frazier, No. 21-CR-30001-DWD, 2021 WL 1545985, at *1 (S.D. Ill. Apr. 20, 2021) (denying motions to substitute Brindley and his colleague as retained counsel for two co-defendants and noting that they failed to provide written conflict waivers

despite court order); <u>United States v. Sanchez</u>, No. 12-20008, 2013 WL 3463611, at *1 (C.D. Ill. July 9, 2013) (disqualifying Brindley's law office from representing two co-defendants). All of this severely undermines Attorney Brindley's suggestion that the Court should simply take him at his word and defer to his evaluation of the potential conflicts present in this case.

In sum, the Court declines to credit Attorney Brindley's assertions that he can loyally and ethically represent Melton despite any conflicts of interest, in light of Attorney Brindley's history, in this case and elsewhere. The Court proceeds, then, to engage in its own review of these questions.

    B.   <u>Richards's Dominant Relationship with Brindley</u>

This is not a case in which the lawyer at issue has independent and roughly equivalent ties to each of the clients he seeks to represent. Quite the opposite. The record shows that both Richards and Melton view Brindley as Richards's lawyer (or the lawyer for his "organization") whose loyalty runs, first and foremost, to Richards—and that Brindley has behaved in conformity with this view.

Though Attorney Brindley has been practicing for more than twenty years and is experienced in defending clients facing criminal charges, his first appearance in this District is the one he entered for Melton in this case.[18] As explained above, Richards provided the link between Melton (with whom Richards was acquainted personally and, allegedly, criminally) and Attorney Brindley (with whom Richards had a longstanding relationship). Attorney Brindley's appearance in this matter for Melton is the result of the two men's mutual connection to

---

[18] Brindley was admitted to the Illinois bar in 2004, and his practice is based in Chicago. <u>See</u> Doc. No. 97-1 at 1. Decisions of other federal courts have described Brindley's experience in private criminal defense. <u>E.g.</u>, <u>Hofschulz</u>, 2020 WL 832899, at *5–27. It is undisputed here that he has long represented Richards, and the success he achieved for Richards in a previous appeal and retrial undoubtedly earned Brindley tremendous gratitude from Richards—gratitude which almost certainly contributed to Richards's referral of Melton to Brindley in this case.

Richards.  But for his relationship to Richards and Richards's referral, Melton would almost certainly have a different (likely New England–based) lawyer for this Massachusetts-based prosecution.  This fact alone would not normally be cause for concern, but the surrounding circumstances make plain that this was no mere benign referral.

Before Melton's arrest, Richards assured Melton that he provided "a protection safety," "[a] guarantee you'll never go to jail" while working with Richards and his "outfit," and a promise that his associates "do not cooperate."  Doc. No. 183-1 ¶ 16.  He reiterated that Melton would "never have to worry about anything" because "everybody has my lawyer [i.e., Brindley] and we never talk," "never cooperate."  Id. (emphasis added).  Richards further claimed to "know the law" because of "studying law for over 20 years," experience as "a law library clerk," and "work[ing] closely with a law firm out of Chicago [i.e., Brindley's firm]."  Id. ¶ 15.  With these statements, Richards essentially explained to Melton that they were part of the same "oufit," that the outfit was controlled by Richards, and that Richards oversaw everything including arrests, prosecutions, and selection of defense counsel.  Richards's comments also emphasized that protection of the organization ("my outfit") is the highest priority of every legal defense.  The record before the Court, and the foregoing evidence in particular, persuades the Court that Richards views Brindley as his lawyer, for whom protection of Richards and his operation is the paramount objective.

True to Richards's word, a few weeks after Melton's arrest, Attorney Brindley appeared to represent him in this case after obtaining his first-ever pro hac vice admission in this District.  This suggests Melton understood and believed the message Richards had delivered months earlier about Brindley, and also that Attorney Brindley took steps to fulfill the role Richards had described.

The March 2024 letter Melton wrote to Pires further evidences Melton's belief that Brindley took orders from Richards. In the letter, Melton asked Pires to have Richards ("unc") tell Brindley ("the lawyer"—not "my lawyer") to file motions in this case in the wake of Melton having learned that the prosecutor might seek a sentence of thirty years. Doc. No. 221-5 at 3. He also appeared to express frustration with what he perceived as Brindley's inaction on his behalf to that point. See id. at 4 (asking Pires to tell his family "no more $ for lawyer until he start doing shit"). That Melton wanted Richards to communicate with Brindley on his behalf in these circumstances demonstrates Melton's perception that Richards controlled Brindley— including vis-à-vis his representation of Melton—and that Brindley answered to Richards.

That Attorney Brindley's cardinal loyalty is to Richards is confirmed by the course of events since Melton's indictment in this case. Having been retained by Melton in this case, it made perfect sense for Brindley to represent Melton when he was later charged by the government in Melton II. In the Court's experience, most defendants would (and should) prefer to have the same lawyer representing them when facing more than one federal criminal case at the same time. When Melton III came along, however, Attorney Brindley immediately appeared for Richards (his longstanding client), rather than Melton (his only client, to that point, in Massachusetts). Again, in the Court's experience, the typical preference among defendants to have the same lawyer represent them in concurrent cases is (and should be) especially strong where the cases are pending in the same district and concern the same category of offenses. As applied here, these considerations suggest that Melton would have preferred to hire the same lawyer to represent him in all three of his federal cases (and most definitely both of his drug-trafficking cases in this District).

Yet, both Brindley and Melton claim that Melton chose to seek other counsel in Melton III and wanted Brindley to appear in that case for Richards, his co-defendant. Mot. Hr'g, Rough Tr. at 31–32, 68, 70 (July 16, 2025). The Court rejects this patently incredible assertion. Having retained Attorney Brindley already for two ongoing cases, Melton's obvious choice for a lawyer when indicted a third time was Brindley. In the circumstances presented, the Court finds by a preponderance of evidence that Melton did not pursue this obvious choice only because he understood it to be impossible given Richards's expectations and Brindley's ultimate loyalty. And as a result, the least favorable outcome for someone in Melton's position occurred. Not only was Melton prevented from having the same lawyer handle all three of his cases, but the lawyer he retained in his first two cases is representing his co-defendant in the third.[19]

In sum, the record before the Court causes it to conclude that Attorney Brindley's relationship with and overriding loyalty to Richards creates a significant risk of limiting his ability to effectively and vigorously represent Melton. Attorney Brindley himself has conceded that his relationship with Melton "is not the kind of relationship that [he has] with Mr. Richards," whom he is simultaneously representing in a case that is not entirely independent of this one.[20]

---

[19] A review of the dockets in this case and Melton III suggests further support for the Court's finding that Attorney Brindley's loyalty to Richards is paramount and has already impacted his litigation decisions. Compare Doc. Nos. 141, 148, 169, 177 (reflecting June 2024 filing of motion raising serious constitutional challenge to Melton's conditions of confinement, allowance of leave to file reply, then no reply filed and no further action taken by Brindley on Melton's behalf for more than seven months before eventual denial of motion as moot), with Melton III, Doc. Nos. 17, 26, 45 (reflecting two motions within two months challenging Richards's detention and filing of timely reply).

[20] It bears noting that, were he permitted to continue representing both men, Attorney Brindley's dueling duties of loyalty and confidentiality would require him to segregate in his mind any information learned from Richards (as well as Richards's views and interests) when advising Melton in this case. Likewise, in Melton III, Brindley must undertake the same task, setting aside Melton's information and interests. The concerns noted above about Brindley's candor and grasp of the serious ethical dilemma this case presents persuade the Court that he will not carefully attend to the task.

Mot. Hr'g, Rough Tr. at 45.  Indeed, the government anticipates seeking to admit in the Melton III (where Brindley represents Richards) evidence about the conduct at issue in this case (where Brindley represents Melton).  In these circumstances, the Court cannot conclude that a conflict waiver, even after consultation with independent counsel, neutralizes the risks presented by Attorney Brindley's conflicting duties of loyalty.

## C.    Advice Regarding Cooperation and/or Pleas

Further concerns arise in this case when it comes to Attorney Brindley's ability to provide Melton full and impartial advice concerning whether to plead guilty or go to trial, and whether to seek or entertain a cooperation agreement with the government.  Both of these decisions—whether to cooperate, and whether to plead guilty—are solely Melton's to make.  Cf. Florida v. Nixon, 543 U.S. 175, 187 (2004) (identifying "guilty plea" as "an event of signal significance in a criminal proceeding" as to which defense counsel "undoubtedly has a duty to consult with the client" but "lacks authority to consent . . . on a client's behalf").  The rules of professional responsibility as well as the United States Constitution entitle Melton to zealous and impartial advice on these issues free of conflicts.  The Court finds, on the record before it, that Attorney Brindley cannot give Melton such advice here.[21]

As far as cooperation is concerned, any agreement with the government conditioned on providing assistance would inevitably involve entertaining the possibility of testifying against Richards—who, of course, is also Brindley's client.  Plainly, Attorney Brindley cannot meaningfully advise Melton about that possibility.  This is so whether or not Brindley adheres to

---

[21] This question is perhaps more theoretical than urgent at this time, given Melton's unequivocal statements after consultation with independent counsel that he has no desire to pursue a plea or cooperation.  However, he remains entitled to unconflicted advice about these decisions, the importance of which is amplified for a person (like Melton) facing multiple prosecutions at once.  And, in the Court's experience, many defendants, in all sorts of cases, decide to pursue a plea or cooperation despite initially and adamantly opposing these choices.

his stated policy of not representing persons who cooperate with law enforcement. As noted above, the record establishes that both Richards and Melton were well aware of that policy even before Attorney Brindley described it to the Court in hearings related to the pending motion. The mere existence of the policy, in this case, has consequences that could impede Melton's ability to make an informed decision about whether to speak with the government. If Melton were to reconsider his current position and wish to explore cooperation, Attorney Brindley would withdraw from this case. The withdrawal would signal to Richards, who knows about Brindley's policy, that Melton was likely cooperating (and, given the circumstances, that the cooperation likely implicated Richards).[22] To be sure, Melton is not required to cooperate—now, or ever— and the Court is not suggesting he must or even should do so. He is, however, entitled to independent advice on this question throughout this case—now, and also after he receives discovery in Melton III (something that has not yet occurred but could bear on his decisions about how to proceed in both cases).

Apart from any consideration of cooperation, Melton is constitutionally entitled to independent and unconflicted advice about whether to plead guilty or go to trial—a decision that is his, and his alone. See Nixon, 543 U.S. at 187. Here, an informed decision about whether to go to trial will require evaluation of the evidence and potential risks associated with Melton III. Any diligent lawyer advising Melton about the risks and benefits of a guilty plea in the present case would necessarily consider and discuss with him a host of issues, including: the implications of such a plea for Melton III; the implications for trial (or plea) in Melton III of a

---

[22] This general consequence of Brindley's no-cooperation policy presents a separate ethical quandary—specifically, the fact that the policy itself could, in some circumstances, lead to a de facto violation of Brindley's duty of confidentiality to the client-turned-cooperator. That question, however, is outside the scope of this decision.

conviction or acquittal after trial in this case; the benefits and drawbacks of a global plea

encompassing both cases; and whether the two cases could or should be consolidated for trial,

see Fed. R. Crim. P. 8, 13.[23]  Melton's interests are distinct—and may differ—from Richards's

as to each of these issues.  For example, Richards might prefer to have Melton present as a co-

defendant at a trial in Melton III (for example, because his presence would allow jurors

persuaded beyond a reasonable doubt that drug trafficking occurred to convict someone other

than him, whether or not he takes a defense position that is antagonistic to Melton), while Melton

might prefer a separate trial to avoid the admission of evidence about events that do not directly

concern him (for example, seizures of money attributable to Richards that occurred before the

two men met).  Whether the two men have these preferences or the opposite ones, the

considerations bearing on each man's evaluation of these options will not be identical.

    The Court finds that Attorney Brindley cannot provide Melton unconflicted advice about

these questions of whether to cooperate or plead guilty, because Melton's interests as to both

questions may very well conflict in a variety of ways with the interests of Richards, Brindley's

other (and principal) client.  In making this finding, the Court has considered and credited

Melton's vehement assertions that he presently intends to fight all three of his federal cases at

trial.  It is Melton's right under the Constitution to do so, and the Court does not question the

sincerity or wisdom of that course of action.  Nevertheless, Melton is entitled to unconflicted,

effective advice in making—and, when circumstances such as the disclosure of new details in

discovery justify it, reevaluating—these decisions.[24]  The potential conflicts posed by Attorney

---

[23] The Court takes no position on whether any party could permissibly join the two cases for
trial.  It merely notes that there are rules authorizing consolidation in certain circumstances, and
Richards and Melton each have their own interests, which might differ as to this issue.
[24] Providing meaningful advice on these issues is nearly impossible until Melton and his counsel
have received and reviewed the discovery in Melton III.  Only then can a serious assessment of

Brindley's representation of Melton in this case and Richards in <u>Melton III</u> will necessarily and materially hamper his capacity to provide the type of advice on these issues that the Constitution guarantees Melton.

        D.    <u>Totality of Circumstances</u>

After carefully considering all of the foregoing factors in the overall context of this case, the Court finds itself having reached the "measure of last resort." <u>Abdelaziz</u>, 2020 WL 618697, at *2. Attorney Brindley cannot constitutionally and ethically represent Melton in this action, and no waiver or colloquy responses from Melton can avoid this result. The Court concludes, based on the evidence, that Attorney Brindley has a longstanding, enduring, and overriding loyalty to Richards not only in <u>Melton III</u>, but generally. That loyalty carries over to this case, impedes Attorney Brindley's ability to diligently and fully advise Melton, and poses a serious risk of undermining the integrity of the criminal trial. It also gives rise to a conflict of interest that is, in the Court's view here, unwaivable.

The Court reaches this decision only after lengthy and deliberate proceedings, multiple written filings from all parties, and serious consideration. Though the Court is cognizant of Melton's presumptive right to face the government represented by the lawyer of his choosing, that right does not always triumph over all other considerations. Here, in the view of the undersigned, it must give way to Melton's constitutional right to diligent, effective, and conflict-free assistance of counsel. Even if Attorney Brindley does not answer directly and exclusively to Richards as to every aspect of this case, a preponderance of evidence persuades the Court that the degree of his enduring loyalty to Richards, the range of actual and potential conflicts, and the

---

the relevant considerations bearing on Melton's decisions about how to proceed in both cases be undertaken.

serious resultant threat to the integrity of the proceedings, taken together, warrant disqualifying Attorney Brindley as counsel for Melton.

IV.    <u>CONCLUSION</u>

For the above reasons, the government's motion (Doc. No. 183), construed as a motion to disqualify, is ALLOWED.  Attorney Brindley is DISQUALIFIED from representing Melton in this case.  Because he already represents Melton in <u>Melton III</u> and considering the benefits to Melton of having the same lawyer advising him as to both of his pending drug-trafficking cases, the Court appoints Attorney Keith Halpern to represent Melton in this case as well.

In light of the appointment of new counsel, the parties (including counsel for Fonseca) shall file a report stating their joint or separate positions as to whether the trial in this matter should go forward as scheduled.  If one or more parties believe it should not proceed as scheduled as to either or both defendants, they shall state why not and propose a new schedule. The report shall be filed no later than August 20, 2025, and it also may include any other matter the parties wish to bring before the Court at this time.

SO ORDERED.

 /s/ Leo T. Sorokin

United States District Judge